JOAN BERNARD ARMSTRONG, Chief Judge.
|, The defendant-appellant, hereinafter referred to variously as “C. C.”[1] or “the father” appeals a judgment of the trial court, signed on March 18, 2005, permitting his spouse, hereinafter referred to variously as “H. S. C.” or “the mother”, to relocate their minor daughter[2], hereinafter referred to variously as “H. C.” or “the child”, to Medford, Oregon.
The parents were married on October 25, 1998 in New Orleans. One child was born of this marriage on April 13, 1999, the little girl who is the subject of this relocation litigation. The parties separated on December 1, 2001, filed for divorce on February 26, 2003 and the judgment of divorce was signed on June 5, 2003. From the time of the separation the child lived with the mother, although she visited frequently with the father as he picked her up after school and kept her for a couple of hours until the mother got off from work.
In June of 2004, the mother sent the father a letter[3] informing him that “it is necessary for me to move on with my life in a new place.” The target date for the contemplated move was projected to be in the coming August, as “I believe the school year starts around the 16th of August.” The letter did not state where that 12new place might be. The letter did state that the mother felt that she would benefit professionally; that the unnamed city had virtually no crime; that the child and the child’s half-brother “would also not feel the constant stress level that is between the two of us”; that the two children would benefit from going to the same school and being on the same schedule; that it would eliminate the daily after-school transfer of the child between houses that resulted in inconsistent rules and levels of discipline. The letter offered to allow the child to visit the father during the summer and alternating major holidays.
In response, on July 12, 2004, the father filed an opposition to relocation as a result of which the trial court issued a custody evaluation order on July 23, 2004, ordering the parties to contact the court appointed custody evaluator, Ms. Clare Hesse. A trial on the relocation was ultimately heard on March 8, 2005, resulting in the judgment signed on March 18, 2005, allowing the relocation, which is now before the court on this appeal.[4]
The judgment also established the following:
The visitation dates for [H.C.] to visit with her father and paternal grandparents are:
During March 2005 every Tuesday night, an overnight visit.
During April and May 2005, every Tuesday and Wednesday nights.
From June 1, 2005 for six consecutive weeks then returned to Heather Crab-tree.
*740 In odd years (2005) father will have child for Christmas and even years (2006) for Thanksgiving.
[3Mother will have child on those holidays in the opposite order.
In the summer of 2006 and during this (2005) summer, child support payments are suspended for [t]he period of time child is with father, which money is to be used to pay for summer camps for [H.C.] Child support payments are to be paid for the period of time per month with mother.
The summer of 2006 father will have the child for ten (10) weeks, June July and first two weeks in August and for the same time period each year thereafter. Resumes of those persons who will be caretakers for [H.C.] while with [H.S.C.] will be sent to [H.C.’s] father, also [H.C.’s] doctors, school, report cards, etc.
The father filed a motion for new trial. On May 13, 2005, the trial court signed a judgment denying the application for new trial; declaring that the trial court retained jurisdiction over the matter; and specifying how the transportation costs of the child’s visitation should be allocated between the parents.
This is what is known as a “child relocation” case and falls under La. R.S. 9:355.13, et seq. According to the leading relocation case, Curole v. Curole, 02-1891 (La.10/15/02), 828 So.2d 1094, the trial court’s determination in a relocation matter is entitled to great weight and will not be overturned on appeal absent a clear showing of abuse of discretion. Id., 02-1891, p. 4, 828 So.2d at 1096. Pursuant to La. R.S. 9:355.12, the relocating parent has the burden of proving that the proposed relocation is: (1) made in good faith; and (2) in the best interest of the child. Id. The legislature considered other possible ways of allocating the burden of proof in relocation cases, but instead made the specific, conscious decision to impose this burden on the parent seeking to relocate the child. Id., 02-891, p. 5, 828 So.2d at 1097.
|4In Curóle the Court noted that: “La. R.S. 9:355.12 sets forth eight factors the court must consider in determining whether the proposed relocation is in the best interest of the child.” Id., 02-1891, pp. 5-6, 828 So.2d at 1097. The Curóle opinion then quotes the eight La. R.S. 9:355.12 factors.
In Leaf v. Leaf, 05-0592 (La.App. 4 Cir. 3/2/06), 929 So.2d 131, this Court, in relying exclusively on the authority of Curóle in deciding the question of relocation, noted that there are twelve factors to be considered under La. R.S. 9:355.12. This is not inconsistent with the quotation in Curóle of the eight factors set forth above. Rather it represents an amendment to La. R.S. 9:355.12 by Acts 2003, No. 676 § 1, subsequent to the date of the Curóle decision, but effective prior to the instigation of these proceedings in 2004, adding the following four factors to the original eight[5]:
(8) The current employment and economic circumstances of each parent and whether or not the proposed relocation is necessary to improve the circumstances of the parent seeking relocation of the child.
(9) The extent to which the objecting parent has fulfilled his or her financial obligations to the parent seeking relocation, including child support, spousal support, and community property obligations.
*741 (10) The feasibility of a relocation by the objecting parent.
(11) Any history of substance abuse or violence by either parent, including a consideration of the severity of such conduct and the failure or success of any attempts at rehabilitation.
IfjThe appellant assigns as error the allowing of the relocation when taking into account the statutory factors. Although La. R.S. 9:355.12 mandates that all of the factors it sets forth be considered in making the determination regarding a proposed relocation of a child, it does not require a court to give preferential consideration to any certain factor or factors. Curole, supra, 02-1891, p. 828 So.2d at 1097; Blackburn v. Blackburn, 37,006 (La. App. 2 Cir. 1/29/03), 836 So.2d 1222.
There are no written reasons for judgment in the instant case. While there is no doubt that the trial court expressed a very genuine concern for all parties affected by this difficult situation, especially the child, it is very difficult for this Court to determine whether or how the trial court considered any or all of the factors. This raises the question of whether the trial court is required to explicitly reference the twelve factors either orally or in writing in reaching its decision, or whether this Court may somehow infer that it did so from the record. Leger v. Leger, 03-419 (La.App. 3 Cir. 7/2/03), 854 So.2d 955, pursuant to Johnson v. Johnson, 99-1933 (La. App. 3 Cir. 4/19/00), 759 So.2d 257, suggests, in a portion of the opinion entitled “Failure to Address Factors with Particularity” [6], that the answer is the former and that we may not assume that the trial court actually considered the twelve factors based on the fact that there was evidence in the record that would have permitted it to do so.
In Leger, supra, the court noted that: While the trial court listed the factors to be considered, it did not consider the factors individually concerning particular evidence presented.
| fjd., 03-419, p. 2, 854 So.2d at 956.
Similarly, in Johnson, supra, the court stated that:
We find the court erred, however, by failing to apply an analysis of the above [La. R.S. 9:355.12]factors to its findings of fact.
Id., 99-1933, p. 7, 759 So.2d at 260; See also Hodges v. Hodges, 02-0489 (La.App. 3 Cir. 10/2/02), 827 So.2d 1271 and Hoskins v. Hoskins, 36,031 (La.App. 2 Cir. 4/5/02), 814 So.2d 773.
In Hoskins, citing to Johnson, supra, the court held that the failure of the trial court to conduct an analysis of the statutory factors was legal error. Consequently, a de novo review was in order. In Hos-kins the issue before the court was the factors set forth in La. C.C. art. 134. However, the jurisprudence equates those factors to those of La. R.S. 9:355.12, and, as noted, in reaching its conclusion, the Hoskins court relied on the Johnson opinion, an La. R.S. 9:355.12 case.
In the following La. R.S. 9:355.12 cases, the opinions note that the trial court addressed the factors specifically: Curole, supra; Peacock v. Peacock, 39,950 (La. App. 2 Cir. 5/4/05), 903 So.2d 506; Larsen v. Polk, 02-1104 (La.App. 5 Cir. 2/25/03), 841 So.2d 992; Blackburn, supra; Dettman v. Rablee, 01-1228 (La.App. 1 Cir. 9/28/01), 809 So.2d 373; Brisbois v. Brisbois, 00-203 (La.App. 5 Cir. 8/29/00), 767 So.2d 887; Franklin v. Franklin, 99-1738 (La.App. 3 Cir. 5/24/00), 763 So.2d 759; *742 Deason v. Deason, 99-1811 (La.App. 3 Cir. 4/5/00), 759 So.2d 219.
In Curole, supra, the Supreme Court noted that: “[T]he trial court properly considered each of the factors listed in La. R.S. 9:355.12 ...” Id., 02-1891, p. 12, 828 So.2d at 1100.
|7In the following cases, we can infer from the fact that the appellate courts’ written opinions discuss each of the statutory factors without referring to any of the trial courts’ findings regarding those factors, that the record did not reflect that the trial court addressed the requisite factors: Nelson v. Land, 01-1073 (La.App. 1 Cir. 11/9/01), 818 So.2d 91; Richardson v. Richardson (Blackmar), 01-0777 (La.App. 1 Cir. 9/28/01), 802 So.2d 726. These cases appear to implicitly involve de novo reviews.
In Englebrook v. Guillory, 01-1404 (La. App. 3 Cir. 4/17/02), 824 So.2d 376, the Third Circuit in reversing the trial court, noted that the trial court had failed to mention in its oral reasons (there apparently being no written reasons) whether it had considered the La. R.S. 9:355.12 factors, but did not ascribe that as the reason for reversal. Instead, without explicitly stating a standard of review, the Third Circuit appears to have reversed based on a de novo review. In a concurring opinion, Judge Saunders took the position that the trial court “erred by failing to apply an analysis of the above [La. R.S. 9:355.12] factors to its findings of fact when rendering its decision.”
Miller v. Miller, 01-0356 (La.App. 3 Cir. 10/31/01), 799 So.2d 753, is unique in the La. R.S. 9:355.12 jurisprudence. In Miller the Third Circuit had before it a trial court opinion that referred to all of the La. R.S. 9:355.12 factors but only discussed three of them specifically. The Miller court upheld this approach based upon the following reasoning:
In Johnson, we found that the trial court erred in its application of the relocation statute because, [w]hile the trial court listed [the relocation] factors in its [written reasons for judgment], it did not analyze them as required by La.R.S. 9:355.12. Johnson, 759 So.2d at 259. Thus, in Johnson, we analyzed the factors from the facts in the record. Peggy advocates that because the trial court did |Rnot consider all of the factors of La.R.S. 9:355.12, this court should do so. We disagree.
Johnson does not stand for the proposition that the failure of a trial court to give equal weight to each factor in La. R.S. 9:355.12 is an error of law. [FN1 omitted.] Louisiana Revised Statutes 9:355.12 states that the court shall consider the listed relocation factors. After noting the applicable statutes, the trial court stated:
Although Ms. Miller’s reasons for relocating are in good faith, the court finds that they are more for her interest than for the children. Her reason for being near her extended family members is more personal than the best interest of the children since the children have had virtually no contact with the maternal side of the family. Lake Charles is the only home these children have known and the children have playmates, schoolmates, ball team members and a rather extensive extended paternal family in the Lake Charles area. Ms. Miller’s desire to attend nursing school in the relocation area could be accomplished at the various colleges in the Lake Charles area. The 3rd factor would be a strain to say the least, due to the distance between the parties. The court does not find factor five to be strictly applicable to Ms. Miller, however some of her actions from Easter to present *743 have, as it relates to visitation by the father, tend to raise some doubt in the court’s mind as to that factor. Ms. Miller has not met her burden of proof as it relates to factor six. Therefore, the court will deny the relocation of the children.
It is clear the trial court considered all of the evidence in light of the factors listed in La.R.S. 9:355.12, but chose to emphasize only factors three, five and six in its written reasons for judgment. Our review reveals no abuse of discretion with respect to the trial court’s decision regarding the relocation.
Id., 01-0356, p. 6-7, 799 So.2d at 756-757.
| nBased on the foregoing review of the La. R.S. 9:355.12 jurisprudence, we find that the weight of authority indicates that the record must support the conclusion that the trial court actually considered each of the La. R.S. 9:355.12 factors. This is not the same as saying that because there is sufficient evidence in the record to have allowed the trial court to have considered each factor that it must necessarily have done so. However, we are not ruling out the possibility that proof that the trial court considered the factors might be adduced from other than a rigid formulaic factor by factor analysis by the trial court, much as appears to have been done in Miller, supra.
We also find that the weight of the above authority indicates that where the record does not support a finding that the trial court actually considered each separate La. R.S. 9:355.12 factor does not mandate a reversal on that ground alone — the appellate court may remedy the deficiency via a de novo review, which we will now undertake in the instant case, factor by factor, based on the evidence in the record.
Three witnesses testified: Clare Hesse, a Licensed Professional Counselor, and court appointed expert in this case; the mother; and the father. (The child did not testify because of her tender age. However, based on the testimony of the witnesses, we can deduce what her reaction to the relocation would be.)
Ms. Hesse’s report was not admitted into evidence, but the trial court stated that it was basing its decision largely on that report. While this Court does not have the benefit of that report, we have the best evidence in the form of Ms. Hesse’s live testimony, during the course of which constant references were made to the report.
|inMs. Hesse testified that the child is warmly and securely attached to both of her parents. She acknowledged that the move would create distance between the child and her paternal grandparents and maternal grandmother, all of whom currently live in New Orleans. The father lives with his parents, the child’s paternal grandparents. Mr. Crabtree picked her up after school on almost a daily basis and kept her with him and his parents until the mother could pick her up. The mother was on a different work schedule. Therefore, the child saw her father and paternal grandparents almost every school day. While the child spent occasional nights with her father at the home of her paternal grandparents, Ms. Hesse noted that in the “last year or so” she was resisting this arrangement. Ms. Hesse testified that the father had informed her that the child did not want to be away from her mother overnight. Therefore, the father did not exercise his overnight visitation privileges as he did not want to force the child against her will. Ms. Hesse testified that the child expressed a preference for the way her mother left the lights on in her home at night. According to Ms. Hesse:
*744 I think she is at the age where she wants it just a certain way that she is used to.
Ms. Hesse reported that:
[The child] did say that [the paternal grandparents’ house] was her least favorite place to spend the night because it was boring there. [Her paternal grandfather] doesn’t leave the light on at night also.
The child has a 12-year old half-brother on her mother’s side. When the child drew a picture of her family, she did not include James in the picture. She drew another picture including the half-brother, but when she did so she drew him with no eyes:
InShe said she made [him] blind, so that he can’t do bad things.
Ms. Hesse explained what this meant: She said that when she is at Pawpaw’s house, which I believe is her maternal grandfather, she tries to wake [her half-brother] up on the Sabbath Day, so he won’t miss Sabbath school and get in trouble. She is trying to protect [him] from getting in trouble and sometimes [he] hurts her on purpose.
Her three wishes, one of them was that [her half-brother] wouldn’t be so mean. One that was daddy won’t yell at mommy so much; and one that [her paternal grandmother] won’t have to work so much around the house.
The mother identified the main stressors in her life for Ms. Hesse: Having a child (her son, H.C.’s half-brother, referred to above) with attention deficit disorder and mild conduct disorder; dealing with an ex-husband, the father of H.C., “who still needs to control me; and living in the New Orleans area with crime and the school system.”[7]
Ms. Hesse said that she took into consideration the half-brother’s behavioral problems when weighing the catch-all last factor of La. R.S. 9:355.12.
Ms. Hesse testified that the father expressed concerns to her about the mother’s willingness to move all the way to Medford to be near a man she had spent very little time with.
Ms. Hesse expressed concerns about the mother’s ability to obtain adequate child care in a new city where she did not have either the father or the grandparents to fall back on. She noted that the father and his parents would be welcome to | ^come visit at any time, but not to stay overnight in her house. The father’s attorney asked Ms. Hesse:
Q. But isn’t it better for a child, particularly a younger child, to see their parent on a regular and continuous basis and not be away from them?
A. That is recommended in general guidelines for infants and toddlers. Hannah is sort of on the borderline that being five. She is going into a latency period of elementary school age where general guidelines say she can tolerate longer visits and longer separations from a parent.
Q. What is longer visits and longer separations?
A. Well, of course, it is not ideal for it to only be a few times a year. It would be much better for it to be every weekend or every other weekend, but when there is a distance that is not possible.
Ms. Hesse testified that she made her evaluation based on the eight La. R.S. *745 9:355.12 factors as they existed prior to the 2003 amendment adding four more factors.[8] Ms. Hesse testified that she would not have recommended the relocation had she thought that the move would aggravate the half-brother’s behavioral problems to the extent of making him a danger to the child. They already live together.
The trial court admonished counsel for the mother that:
[Y]ou had the opportunity to ask any and everything that you wanted to ask about this report, but you chose not to. You only asked a couple of questions and then you referred to — you moved it to [the father’s attorney] for her cross.
Ms. Hesse testified that the mother had told her among the important negative factors motivating her desire to move were the father’s history of 11sdomestic violence and stalking and what she perceived to be the overly aggressive discipline by the father of her son, his step son. Among the positive factors reported by the mother were the cleaner environment of Medford, the lower crime rate, higher household income, opportunity for career advancement and better educational opportunities. While Ms. Hesse testified that she considered the eight factors of which she was aware, when asked whether she felt that the impact of the move on the father and grandparents “is going to be less important than this lady relocating for the reasons that you have stated in your report,” she responded:
I am not interested in the parents at all whether they are deprived or not. I am only interested in Hannah’s welfare.
Ms. Hesse said that in making her recommendation she took into account how separation from her grandmother would affect the child, recognizing that “the bond between the grandmother and the grandchild is very special, very important.” She also testified that she felt that the mother had given proper consideration to how the special behavioral needs of her son, the child’s half-brother, could be met in Med-ford, either through the support of family members (the mother has a great-aunt and cousin who live there) and/or through the school system which has special education available for behavioral disorders. In order to reduce the stress of the move on the children, Ms. Hesse suggested that they move during the summer in order that they be given a chance to adapt to their new environment prior to having to adapt to a new school situation. She also felt that the move could actually have a positive effect on the half-brother’s behavior as he had witnessed some domestic violence between his mother and step-father and a lot of friction, commotion and stalking, and the move would be an opportunity for him to live in a calmer, more stable environment.
| uMs. Hesse testified that she was told by the mother that her main reason for moving was her career and the environment and that she did not intend to live with the man she hoped to date while there. She added that:
You know, it is a risk for her to go that far away, away from all this extended family. My sense is that the job won’t be a problem. Judging by what information I have about her level of skill in her career, I think that part will work out well. My instinct is that if this fails, and does not work, she will put [the child] first and she will not hesitate to move back, if it doesn’t work out. That is just I can’t give you any facts of why I *746 think that. I just got the impression that the children’s welfare is number one and that is it.
Ms. Hesse testified that even in intact families children move away from grandparents all the time, all over the country, frequently for career reasons. In this case she was confident that the mother was not motivated by any animosity towards the grandparents:
That she understands how close the child is to her grandparents and she is going to do everything she could to support that relationship....
There is no, you know, there is no ideal answer when someone moves [a]way. It is definitely better, as [counsel for the mother] said, if you have to get divorced, if everybody should live next door to each other.
Ms. Hesse went on to explain that any move more than a couple of hours away, too far to drive back and forth on a weekend, even if only to Mississippi or Texas, will result “in the same story.”
The first reason given for wishing to relocate to Medford given by the mother, H.S.C., when she testified was that:
[T]here has been a lot of harassment and stalking issues that went on. The stalking has stopped since the restraining order was placed on him and he violated it ... [T]here still has been verbal harassment either in person or on the phone.
|1BShe testified that the environment was cleaner, schools were better, the crime rate was lower, there were more Seventh Day Adventists (participation in the Seventh Day Adventist church was unquestionably and sincerely a matter of great importance to both parents) with whom she could interact, and there were more nursing jobs available with better opportunities for advancement. She pointed out that in New Orleans she was merely a staff nurse, but in Medford there was a greater likelihood that she could advance to a management position. She testified that she was afraid of her husband. On the other hand she also testified that:
When he is with Hannah, he and Hannah ha[ve] a very good relationship. He is a loving father to her.
She testified that the gentleman that she wished to date in Medford is a police officer and a member of the Seventh Day Adventist church. He has an eight-year old son. She has met him as well as other family members, all of whom are Seventh Day Adventists. While she was out in Medford she spent a substantial amount of time investigating school and nursing facilities. She testified that the nursing facility would get housing for her. She testified that Medford has many activities for children — a park, mountain climbing and skiing, including a winter ski program at the Seventh Day Adventist school. The schools have before and after care programs. She has already started considering potential candidates to baby-sit her daughter.
The mother testified that the child currently has no neighborhood playmates. She felt that she could more likely find a member of her Medford church congregation in whom she could have confidence to baby-sit her daughter.
She has taken trips as long as two weeks with the child and her son without the father or the grandparents. On occasion the child might say that she misses her 11figrandmother, but when asked if she wished to call her, she would say: ‘[N]o, not right now. The mother testified that the child would miss her grandparents, but when asked about the move to Medford:
She wants to go. She says I want to go. I want to be with you mommy.
*747 [[Image here]]
She said, I know I will miss grandma and dad and I can fly on the airplane to come see them.
She also testified that the grandparents would miss the child, but that they had other grandchildren who lived in other places that they managed to visit.
She testified that she would not leave until she had a job, even if it meant flying out to Medford six or seven times for interviews. She would have a place to stay secured before she left.
She felt it was in the child’s best interest to move because of the unhappy memories arising out of the pre-divorce domestic turbulence and the ongoing tension existing between her and her husband. On cross-examination she testified that it would be in the best interest of the child to move because while the father had never been abusive to her, he had been abusive to the child’s half-brother while in the home.
She testified that she expected to go up to Medford initially on a 13-week assignment, with the option to extend at the end of the assignment. She admitted that she currently did not have a permanent position in Medford. She also admitted that as a new hire without seniority that she would likely have night-shift work or weekend work:
Q. So you would be working every other weekend, but you don’t have any definitive plans at this point for the child care for Hannah when you go up there?
|17A. At this point, no, no because I haven’t been able to take and establish a friendship with somebody and find suitable day care for her.
Because of her tender age, the airlines would only allow her to take direct flights. She could not fly where connecting flights would be necessary. There are no direct flights from Medford to New Orleans. In order to put the child on a direct flight to New Orleans, the mother would have to drive the child for five hours to Portland or Sacramento, or drive six hours to San Francisco. Such a round trip flight in the Christmas season could run from $350.00 to $400.00.
When asked about child support payments for the child, the mother responded that the father has generally been more or less on time, but that in the last month before the hearing he had given her $300.00 on the tenth of the month out of the $445.00 due and promised the balance by the eighteenth, but she did not actually receive it until the twenty-second. She admitted that the letter she sent to the father notifying him of her intended move did not indicate where she intended to move because at the time she sent the letter she did not know whether she wanted to move to Medford or to the Fort Worth area.
She explained that some of the indefiniteness concerning her prospective arrangements in moving to Medford is because it will take time and money to get things like her Oregon nursing certificates, time and money that is difficult to justify prior to a ruling by the court permitting her to relocate with the child.
She testified that her decision to move away from the father was not prompted by the relationship that was developing between her and the gentleman she was becoming interested in Medford, but that the choice of Medford as the [ isplace to carry out the desire to move was influenced by her interest in this gentleman.
She testified that her anticipated salary would be approximately the same as it is in New Orleans. She testified that if the relationship with the new gentleman did not work out and the children did not like *748 Medford, her plan was to move to the Fort Worth area.
The father testified that he and his daughter go to the park, various functions, play outside, do homework together and go on field trips.
His salary is approximately $32,000.00 per annum. Based on the percentage of child support required of each parent, we can assume that the mother probably makes almost twice what the father makes.
The father testified that it would be both a scheduling and a financial hardship for him to fly out to Oregon because of his limited income and the fact that he usually works holidays and only gets two weeks vacation. His company usually does not allow vacation time to be scheduled during the week between Christmas and New Years, which would apply even if the child came here for the Christmas holidays.
He testified that he voluntarily attended an anger management class. He is classified as a Police Officer 2, a corporal position with the State of Louisiana, a position that is not transferable to Oregon.
The father’s testimony indicated that while the child would miss her mother if she came to visit, and might not prefer overnight visitations, if she were required to come for scheduled visits that, “she will quickly feel comfortable with me in spending the night.”
|19We will now evaluate each of the twelve La. R.S. 9:355.12 factors in light of the foregoing review of the record as a whole:

(1) The nature, quality, extent of involvement, and duration of the child’s relationship with the parent proposing to relocate and with the non-relocating parent, siblings, and other significant persons in the child’s life.

The record indicates that the child has a positive relationship with her father and her New Orleans based grandparents, but that her strongest ties are to her mother.

(2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child’s physical, educational, and emotional development, taking into consideration any special needs of the child.

The record reflects that the child was five years old at the time of the hearing on March 8, 2005. Special needs are not an issue. The mother contends that the educational system is better in Medford, Oregon than it is here in New Orleans. By fortunate happenstance, the expert appointed by the trial court, Clare Hesse, has relatives in Medford and had made a number of family trips there. She confirmed, based on her own firsthand knowledge, that Medford offered educational advantages over those available here. The child is accustomed to being primarily with the mother and preferred to spend the night in the mother’s home, which she normally did, except on those occasions when the mother was out of town. On those occasions the child stayed overnight with the father who lived in his parents’ home, the grandparents of the child. Both parents testified that the child would accept leaving the mother for visitation trips to New Orleans with the father and her grandparents.

Ln(8) The feasibility of preserving the relationship between the non-relocating parent and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.

The judgment of the trial court addresses this issue with detailed visitation instructions as quoted at the outset of this opinion. The court appointed expert noted that while the child would see her father and New Orleans based grandparents less *749 often, this would be compensated for by the fact that on those occasions when she did visit the stays would be of several days duration instead of the more frequent but brief, two hour visits she customarily made to her father after school until her mother could pick her up after work. The financial arrangements, while tight, appear workable.

(í) The child’s preference, taking into consideration the age and maturity of the child.

The child, while loving her father and grandparents, would prefer moving to Oregon, leaving them behind except for visits, than being without her mother, which is normal for a child her age, according to the expert.

(5) Whether there is an established pattern of conduct of the parent seeking the relocation, either to promote or thwart the relationship of the child and the non-relocating party.

The mother readily acknowledges the loving relationship that exists between the child and her father and has not sought to thwart it in the past and does not intend to in the future.

(6) Whether the relocation of the child will enhance the general quality of life for both the custodial parent seeking the relocation and the child, including but not limited to financial or emotional benefit or educational opportunity.

| ^The record indicates that the relocation will offer the mother improved opportunities for advancement as well as better schools for the child, all in a cleaner and safer environment than exists in New Orleans. Additionally, relocating would offer the mother a chance to move on with her life post divorce and, at the same time, offer the child a chance to be free of the friction that exists between her parents. (7) The reasons of each parent for seeking or opposing the relocation.
Both parents appear to have good faith reasons for seeking or opposing the relocation. There is no question that the father opposes the relocation because he genuinely loves the child and his motive in opposing the relocation is not vindictiveness. On the other hand, the mother’s reasons for relocation are equally sincere, and on the whole, are more compelling.

(8) The current employment and economic circumstances of each parent and whether or not the proposed relocation is necessary to improve the circumstances of the parent seeking relocation of the child.

The record supports a finding that by moving, the relocation might enable the mother to advance to a management position. The husband’s job would not be affected by the relocation, and his job is not portable, while the mother’s job is.

(9) The extent to which the objecting parent has fulfilled his or her financial obligations to the parent seeking relocation, including child support, spousal support, and community property obligations.

While the father may not have been consistently punctual in making his child support payments, he was essentially current. Any recent tardiness was immaterial and the mother did not testify that it caused her or the child any hardship. la;,(10) The feasibility of a relocation by the objecting parent.
As noted previously, the father’s job is not portable. He does not wish to leave his parents. We would have to conclude that it is not feasible for him to relocate. (11) Any history of substance abuse or violence by either parent, including a consideration of the severity of such conduct and the failure or success of any attempts at rehabilitation.
There is a history of domestic violence and abuse. There are also indications that *750 the father has largely succeeded in rehabilitating himself. However, the record also indicates that while the violence and stalking appear to have ceased under court order, there is ongoing anger on his part and a great deal of resulting friction that would be alleviated by allowing the relocation. This factor strongly favors relocation.

(12) Any other factors affecting the best interest of the child.

The court appointed expert expressed some concerns about the child’s half-brother who has behavioral problems, but he has never been violent to the child. Moreover, his problems would exist regardless of whether the mother relocated with him to Oregon or stayed here in New Orleans, the only difference being that there appear to be more resources available in the Med-ford educational system for children with behavioral problems.
Based on our de novo analysis of the above twelve factors, we find no factors that would prevent relocation. After weighing the factors as a whole, we find that they weigh heavily in favor of allowing the relocation. Accordingly, we find that the mother has successfully borne her La. R.S. 9:355.13 burden of proving that the relocation is in the best interest of the child.
UaFor the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.

. Initials are used to protect the identity of the minor child.

. The child was one month shy of turning six at the time of the hearing.

. This letter appears to be the notice of relocation required by La. R.S. 9:355.3.

. The trial court ruled in favor of the relocation from the bench, but the judgment was not reduced to writing until a few days later.

. The first seven factors retain their original numbering in the amended statute, but the original factor number eight has been retained but renumbered as "(12)”. The four new factors are numbered "(8)” through "(11)”.

. Id,, 03-419, p. 1, 854 So.2d 955

. We might take judicial notice of the fact that, if anything, stress levels in the city have increased significantly post Katrina,

. Much later in the hearing, during the course of the mother’s testimony, the mother's attorney stated erroneously that the four factors added to La. R.S. 9:355.12 were not in effect when Ms. Hesse made her evaluation