MAX N. TOBIAS, JR., Judge.
hThe plaintiffiappellant, John Paul Louis LaGraize (“Mr. LaGraize”), appeals from two judgments; one that permitted the defendant/appellee, Lily Virginia Filson (“Ms. Filson”), to relocate their minor child to Italy for a period of three years and the second that set up a custody and visitation schedule through 14 September 2015. Finding no abuse of discretion by the trial court in this fact-intensive case on the relocation issue, we affirm the judgment. However, we reverse in part the second judgment and remand the matter to the trial court for further proceedings.

Facts and Procedural History

I.
According to Mr. LaGraize, Ms. Filson and he dated from September 2012 through March 2013, resulting in Ms. Fil-soris pregnancy with VLF, who was born on 26 July 2013. The couple was not married, and Mr. LaGraize lived and worked in Mobile, Alabama. He tried to be involved during the pregnancy; however, Ms. Filson, who lived in New Orleans, discouraged him because she was uncertain if |?he was the father. He rekindled their relationship in July and requested a paternity test, hoping to learn if he was the father. When Ms. Filson went into labor, he went to the hospital and wanted to go into the delivery room, but she did not permit it. About a month after the birth, the paternity test confirmed that he was VLF’s father, and he had his name added to the birth certificate. While he was still living in Mobile, Mr. LaGraize tried coming to New Orleans every weekend to see his daughter — usually three to four times a month. However, on some occasions, Ms. Filson refused to let him see VLF, or would not respond to calls or texts when Mr. LaGraize tried to reach her.
In October 2013, he used a month of unpaid leave from work to be with Ms. Filson and VLF. He took them to Florida for a weekend, spending the rest of the time in New Orleans so he could see his daughter whenever Ms. Filson would allow. He was unable to reach Ms. Filson one entire weekend in that month because she would not answer his calls or text messages.
After several months of commuting and exhausting his paternity leave, he decided to return to New Orleans, even if it meant quitting his job. Fortunately, his company created a position which allowed him to work in New Orleans and telecommute, thereby eliminating the travel requirements for work that he once had.
In December 2013, Ms. Filson first raised the idea of taking VLF to Europe; Mr. LaGraize opposed the idea. The stated purpose of the trip was to attend a conference in Vienna and a fellowship in Prague from April through May 2014. |3Ms. Filson would not give him specific departure and return dates so he did not *1049 know how long the trip would last. This began while' Mr. LaGraize was in the process of moving back to New Orleans to be with his child.
Concerned that the trip might become indefinite, Mr. LaGraize filed a petition to establish custody and visitation, and obtained a temporary restraining order (“TRO”) to stop Ms. Filson from taking VLF out of the country. The trial court conducted a hearing on 16 April 2014 at Ms. Filson’s request to suspend the TRO, and granted her request to take VLF to Vienna and Prague.
By May 2014, Mr. LaGraize had moved back to New Orleans and tried to see his daughter as much as possible after she and Ms. Filson returned from Europe in June 2014. Upon their return, he noticed that VLF was stressed and clingy to her mother, and did not re-bond with him at first; Ms. Filson also noticed the change and anxiety in the baby. After the trip, Ms. Filson restricted him to supervised visits on Saturdays and Sundays, and two hours unsupervised visits on Tuesdays. Immediately before trial, however, Ms. Filson became less restrictive and allowed Mr. La-Graize more unsupervised time with his daughter.
Mr. LaGraize is a native New Orleanian and has a large family in the city and surrounding area. His father lives in Franklinton and Metairie. Mr. LaGraize has three older brothers living in New Orleans, Metairie, and Lafayette, two stepbrothers, plus seven nieces and nephews, and lots of cousins with children, all of whom live in Louisiana. They are a very close family and get together 14frequently. They would like to see VLF more than they have been allowed in the past.
He has tried to bring VLF to visit with his family on weekends from the time she was born, but was limited by the visitation and supervision schedule. Due to this restrictive schedule (only two hours per week unsupervised),, he could visit only close family like his brothers, and can see his cousins only two or three times a month. Ms. Filson has had complete control over VLF and was unwilling to increase his unsupervised visitation until just before the trial.
His entire extended family met VLF when Mr. LaGraize hosted a baby shower for Ms. Filson after the baby was born, inviting his family and friends as well as hers, as well as for VLF’s first birthday party which he hosted. His extended family adores VLF and would like to have a closer relationship with her, but has not had the opportunity to do so.
II.
Ms. Filson had a bit different version of the facts. She stated that in September 2012, she and Mr. LaGraize started dating casually, their relationship becoming more serious in October 2012. In November 2012, Ms. Filson discovered that she was pregnant. As Ms. Filson and Mr. La-Graize were not seeing each other exclusively, she was truthful with Mr. LaGraize that he might not be the father of the unborn child. Mr. LaGraize and Ms. Fil-son continued dating during the initial months of Ms. Filson’s pregnancy through March 2013. After the ^relationship ended, the parties did not speak until July 2013, a week before VLF was born, when the parties rekindled their romantic relationship.
About one month after the birth, a paternity test confirmed that Mr. LaGraize was VLF’s father. Mr. LaGraize had the birth certificate amended to add his name as the father. In addition, Ms. Filson and Mr. LaGraize together filled out an Acknowledgment of Paternity.
From the time VLF was born until May 2014, Mr. LaGraize lived and worked in Mobile, Alabama. While living in Mobile, *1050 he would generally travel to New Orleans most weekends and visited with VLF for only a couple hours on one or both days of the weekend. Ms. Filson invited Mr. La-Graize to her house to spend time with the baby and encouraged him to spend as much time with her as he could.
In October 2013, Mr. LaGraize took paternity leave from his job in Mobile with the expectation of staying with Ms. Filson while he was in New Orleans. During that time, Mr. LaGraize would generally spend a couple of hours with VLF and then go out with his Mends. He would come back to Ms. Filson’s home very late at night while she and the baby were sleeping. Ms. Filson eventually asked Mr. LaGraize not to stay at her house anymore because it became unfeasible for her to take care of the baby while he was using her house as a “crash pad.”
In December 2013, Mr. LaGraize suggested that he might sue Ms. Filson for custody of VLF. As a precautionary measure, in January 2014, Ms. Filson began keeping a calendar of when and how long Mr. LaGraize would visit with VLF. [ fiMr. LaGraize visited with her a total of six days in January for fifteen total hours, four days in February for fourteen total hours, and five days in March for eighteen and a half total hours.
In December 2013, Ms. Filson informed Mr. LaGraize that she had been offered an opportunity to speak at the Scientiae conference in Vienna, Austria in April 2014. She advised Mr. LaGraize that she was planning to speak at the conference and then visit Florence, Italy to reconnect with her professional network after her maternity hiatus. Ms. Filson informed Mr. La-Graize that this trip would last from April to May 2014.
On 27 February 2014, Ms. Filson was awarded the Katerina Duskova Fellowship with the Institute of Art History, Academy of Sciences of the Czech Republic. The fellowship permitted Ms. Filson to use the Institute’s “world-famous” research center and library in Prague for three weeks to continue her research regarding the topic of her Master’s thesis. Because she would already be in Vienna for the conference in April 2014, Ms. Filson intended to travel to Prague to complete her fellowship immediately after the conference in order to avoid the unnecessary, substantial fees of traveling to Europe on two different occasions.
On 11 March 2014, Ms. Filson informed Mr. LaGraize that she intended to leave for Europe on March 27, 2014. She would visit Florence, where she had previously lived from 2009 to the beginning of 2011, until the end of April. She would then travel to Vienna to attend the conference at the end of April. After her conference, she would travel to Prague and complete her three-week fellowship |7and would return to New Orleans at the end of May or early June. Ms. Filson informed Mr. La-Graize that the fellowship was for a fixed duration and could not be extended. At no time did Ms. Filson suggest that she was permanently moving to Europe. Despite Ms. Filson’s assurances that she would be returning to New Orleans in late May or early June, on 17 March 2014, Mr. La-Graize filed a petition for custody,'visitation, TRO, and preliminary and permanent injunctions. In his petition, Mr. LaGraize alleged that Ms. Filson had threatened to relocate VLF out of the state without his consent, without complying with the requirements of the Louisiana Relocation Statute, and without prior approval of the court.[1]
*1051 On 17 March 2014, the court issued a TRO enjoining Ms. Filson from removing VLF from Louisiana pending a child- custody determination by the court. Ms. Filson filed an expedited motion to request that the TRO be temporarily suspended and requested that the court permit her to travel to Europe for the Vienna conference and the Prague fellowship. An expedited hearing was scheduled for 16 April 2014; Mr. LaGraize did not attend. At the conclusion of the hearing, the TRO was lifted to allow Ms. Filson to travel to Vienna and then on to Prague from 19 April 2014 to 5 June 2014.
Ms. Filson attended the conference in Vienna, completed her fellowship in Prague, and timely returned to New Orleans. Although Skype[2] communication |swas limited due to slow Internet service in Prague, Ms. Filson would make VLF available whenever Mr. LaGraize messaged her or contacted her on Facebook. Mr. LaGraize utilized Skype with VLF approximately three or four times while she and her mother were in Prague.
When Ms. Filson returned to New Orleans in June 2014, the parties attended court-ordered mediation in efforts to amicably resolve their custody dispute. During mediation, the parties agreed to a temporary visitation schedule: Mr. LaGraize would enjoy supervised visitation on Saturdays from 12:30 p.m. to 2:30 p.m. and on Sundays from 1:00 p.m. to 3:00 p.m., with Ms. Filson serving as the supervisor, and unsupervised visitation on Tuesday evenings from 6:00 p.m. to 8:00 p.m.
Ms. Filson would accommodate his requests to reschedule visitations whenever he asked. Mr. LaGraize would regularly arrive late for visitation or leave early. He would refuse to enter Ms. Filson’s home for his visitation and would wait outside while Ms. Filson fed and changed VLF. Despite Mr. LaGraize’s behavior and the agreed upon terms of the mediation visitation agreement, Ms. Filson routinely acquiesced to Mr. LaGraize’s requests to have more visitation time and unsupervised visits.
In May 2014, Ms. Filson applied to the University of Ca. Foscari in Venice, Italy for admittance to its Ph.D. fellowship program in the field of Renaissance philosophy and intellectual history. Ms. Filson knew that a Ph.D. offered her far more career opportunities than her current Master’s degree and would dramatically | ¡¡increase her earning potential. With a Ph.D., Ms. Filson would be able to teach at the university level as a full-time professor. With her current degree, Ms. Filson could not make nearly as much income. Unlike Ph.D. programs in the United States that usually take between four and seven years to complete, the fellowship program in Venice would allow Ms. Filson to earn her Ph.D. degree in three years. Furthermore, Ms. Filson’s graduate record examination (“GRE”) score had expired, which would require her to retake the GRE and wait an additional year to begin any program in the United States. Ms. Filson reasoned that it would be best to earn her Ph.D., begin earning an income in her field, and get her and her child’s life more stable before VLF started school. For these' reasons, Ms. Filson decided not to apply to any Ph.D. programs in the United States.
On 22 July 2014, Ms. Filson was notified that she had been offered one of four paid, doctoral fellowship grants annually awarded in her field from the University of Ca. Foscari. In addition to free tuition, Ms. Filson would receive a stipend of roughly *1052 $1,800.00 per month through the Ph.D. fellowship. Since giving birth, Ms. Filson has not been employed. She has never earned enough to file income taxes. The stipend received through the fellowship would, by far, be the most income Ms. Filson ever earned.
III.
At the relocation hearing, the parties each offered expert witnesses to give opinions on attachment theory and the effect of separating a fourteen-month old child from her father for three years. Dr. Alicia Pel-legrin, a clinical psychologist Imwho testified for Ms. Filson, stated that she was an excellent mother. Dr. Pellegrin focused on the importance of maintaining a consistent relationship with whichever person has been the primary caregiver or the primary attachment figure, which in this case was Ms. Filson.
Dr. Pellegrin acknowledged the importance of a child’s relationship with a father in the early years, and the potential deleterious effect later in life that might result if she is deprived of that relationship. Dr. Pellegrin stated that normally she would prefer that a father have daily contact, or at least every other day contact, for a few hours a day. Nevertheless, she concluded in this case that the use of Skype and videos, along with the frequent visits to New Orleans, would suffice to maintain VLF’s attachment and relationship with her father.
Dr. Pellegrin admitted under cross examination that her opinion in this case was diametrically opposite to one she rendered as the court-appointed independent custody evaluator in McLain v. McLain, 07-0752 (La.App. 4 Cir. 12/12/07), 974 So.2d 726. In McLain, she opined that “the quality of the father-child relationship if the minor children remain in Tuscaloosa cannot even approach what it would be if children lived in the same city as their father. She testified that ‘it’s impossible.’ ” Id. at p. 21, 974 So.2d at 738. The factors that made it “impossible” in the McLain case were (i) the time factor of traveling there (a five-hour drive each way), and (ii) the cost factor of traveling to a different city to spend time with the children.
luMs. Julie Ruel, a licensed professional counselor who performs custody and relocation evaluations, testified on Mr. La-Graize’s behalf. She interviewed Mr. La-Graize, reviewed Ms. Filson’s deposition, conducted a home study, and made observations of Mr. LaGraize and his daughter. Given the limited time that VLF spends with Mr. LaGraize, Ms. Ruel found that he has a “surprising[ly] detailed knowledge of her schedule and her preferences and her wants and needs.” She noted that VLF was very comfortable with him and in his home, and obviously enjoyed her time with her father.
Regarding the importance of a child’s attachment with her father, Ms. Ruel explained, “children who have fathers who are more engaged in their lives they tend to have positively collated, advanced linguistics, children tend to be more cognitively advanced.” Attachment is formed for a child under the age of three through the provision of care — by making sure VLF is fed, feels safe, is put to bed when tired — generally, meeting VLF’s day-today needs. She testified that children who lack of relationship with their father are more likely to have trouble in school, self-esteem issues, and difficulty exploring their environment. Attachment with the father is even more important for a girl because identification with the alternate sex parent is important for relating to the opposite sex later in life. She further noted that if the bond or attachment with a father is broken, it will affect VLF for the rest of her life.
*1053 Ms. Ruel also stated that relocation of VLF at the age of fourteen months is particularly detrimental when factoring 'in lack of “object permanence” in a very _Jj¿young child. Without development of object permanence, the father will present as a stranger to VLF within a month or two months of separation. As demonstrated by Ms. Filson’s Europe trip from April to June 2014, VLF had to re-engage with Mr. LaGraize before the bond or attachment relationship could resume. This situation will continue to arise each and every time that she is taken from Mr. La-Graize and then returns. This loss of time would not occur but-for the relocation.
Ms. Ruel did not consider Skype to be a viable substitute for the father’s direct contact because attachment bonding occurs by a caregiver actually providing care. “Hands on interaction either through feeling of security or trust or through providing her with meals, baths, bedtime ... it is more than just hearing a voice or seeing a face.” She concluded that it would be detrimental to VLF if she were taken away from her father at this time.
IV.
After reviewing the evidence and considering the testimony of the witnesses and argument of counsel, the trial court ruled that the proposed three-year relocation to Venice, Italy was in VLF’s best interest and granted Ms. Filson’s request to relocate. The court further awarded the parties joint custody on an interim basis, with Ms. Filson being designated domiciliary parent.
In its oral reasons for judgment, the trial court carefully considered and addressed each factor articulated in La. R.S. 9:355.14. The court concluded that Ms. Filson was VLF’s primary attachment figure and that, while VLF enjoys a |1sclose and loving relationship with Mr. LaGraize, this secondary attachment was not as crucial to VLF’s development as the relationship with Ms. Filson. The court opined that Mr. LaGraize could maintain a good relationship with VLF through telephone contact, Skype, and frequent return visits to New Orleans. It further reasoned that the proposed temporary relocation would significantly improve VLF’s general quality of life by providing her with exposure to another culture, the possibility of becoming bilingual, and by increasing Ms. Fil-son’s earning potential. Finally, in considering the facts and testimony presented. The trial court suggested that Mr. La-Graize’s credibility was questionable, given, in part, that he obtained a TRO in bad faith on the grounds that Ms. Filson had threatened to relocate permanently, when the evidence indicated otherwise.
The judgment of 30 September 2014 states:
IT IS ORDERED, ADJUDGED, AND DECREED that the proposed three (3) year relocation of the minor child, ... VLF, to Venice, Italy, is in the best interest of VLF, and is hereby GRANTED,
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Jean Paul LaGraize and Lily Filson shall have joint legal custody of the minor child, ... VLF, on an interim basis, with Lily Filson designated as the primary domiciliary parent, until further order of the Court.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Court will issue a judgment setting the parameters of telephone contact, Skype, and visitation between VLF and Jean Paul LaGraize.
On 7 October 2014, the court issued a judgment detailing a physical custody schedule, which allows Mr. LaGraize to maximize his visitation time with his daughter when Ms. Filson and VLF are *1054 back in New Orleans and provides him an opportunity to visit with her in Venice for two weeks in March 2015, with travel | uand lodging provided by Ms. Filson. The court further ordered Ms. Filson to make VLF available for regular telephone/FaceTime or Skype contact with Mr. LaGraize when they are in Venice.
Mr. LaGraize devolutively appealed the September 2014 judgment. He also filed a second devolutive appeal of the October 2014 judgment, requesting that both appeals be heard together.
Mr. LaGraize argues that the trial court erred in the September 2014 judgment by misapplying the record evidence to the relocation factors provided in La. R.S. 9:355.14. Specifically, he contends that the trial court: (1) improperly emphasized the quantity of time over quality of time spent with VLF; (2) improperly discounted VLF’s family relationships with Mr. LaGraize’s family as “not significant;” (3) erroneously imposed a higher burden on Mr. LaGraize by requiring proof that the relocation would “necessarily result in a deleterious effect on VLF;” and (4) erroneously found that Skype is a feasible way to preserve bonding and attachment between a fourteen-month old and her father. Mr. LaGraize further argues that the trial court erred in the October 2014 judgment by outlining a schedule for only one year of the three-year relocation and by ordering more videoconferencing time with the relocating parent than the non-relocating parent.

Standard of Review

V.
|1sThe standard of review in a relocation case is that the trial court’s determination “will not be overturned absent a clear showing of abuse of discretion.” Curóle v. Curóle, 02-1891, p. 4 (La.10/15/02), 828 So.2d 1094, 1096. In reviewing the record to determine whether the trial court’s ultimate conclusion constitutes an abuse of discretion, an appellate court must accept each factual finding the trial court made in arriving at that conclusion, unless the particular factual finding is manifestly erroneous. H.S.C. v. C.E.C., 05-1490, p. 23 (La.App. 4 Cir. 11/8/06), 944 So.2d 738, 750. (Murray, J., concurring) (citing Curole, supra).

Discussion

VI.
This case is governed by La. R.S. 9:355.14 that sets forth the governing factors to determine whether a contested relocation is appropriate and in the best interest of VLF. That statute required the trial court, in reaching its decision, to determine whether the relocation was in the child’s best interest to consider at least the following:
(1) The nature, quality, extent of involvement, and duration of the relationship of VLF with the person proposing relocation and with the non-relocating person, siblings, and other significant persons in VLF’s life.
(2) The age, developmental stage, needs of VLF, and the likely impact the relocation will have on VLF’s physical, educational, and emotional development.
(3) -The feasibility of preserving a good relationship between the non-relocating person and VLF through suitable physical custody or visitation arrangements, considering the logistics and financial circumstances of the parties.
(4) VLF’s views about the proposed relocation, taking into consideration the age and maturity of VLF.
[1fi(5) Whether there is an established pattern of conduct by either the person seeking or the person opposing the relocation, either to promote or thwart the relationship of VLF and the other party. (6) How the relocation of VLF will affect the general quality of life for VLF, including but not limited to financial or *1055 emotional benefit and educational opportunity.
(7) The reasons of each person for seeking or opposing the relocation.
(8) The current employment and economic circumstances of each person and how the proposed relocation may affect the circumstances of YLF.
(9) The extent to which the objecting person has fulfilled his financial obligations to the person seeking relocation, including child support, spousal support, and community property, and alimentary obligations.
(10) The feasibility of a relocation by the objecting person.
(11) Any history of substance abuse, harassment, or violence by either the person seeking or the person opposing relocation, including a consideration of the severity of the conduct and the failure or success of any attempts at rehabilitation.
(12) Any other factors affecting the best interest of VLF.
In this case, the parent seeking to relocate with his or her child out-of-state bears the following burden of proof under La. R.S. 9:355.13, to wit: The relocating parent has the burden of proof that the proposed relocation is made in good faith and is in the best interest of the child. In determining the child’s best interest, the court shall consider the benefits which the child will derive either directly or indirectly from an enhancement in the relocating parent’s general quality of life. Id.; see also, Gathen v. Gathen, 10-2312, p. 8 (La.5/10/11), 66 So.3d 1, 6.
|17In its oral reasons for judgment, the trial court analyzed each of these factors. However, because Mr. LaGraize’s assignments of error address primarily Factors 1 through Factor 3 above, we will make these the focus of our discussion.[3]
Factor 1 looks at the relationships in VLF’s life. The trial court stated:
That Lily Filson has been the child’s primary caretaker and is the child’s primary attachment figure. While [the] child enjoys a close, loving relationship with Jean Paul LaGraize, that secondary attachment is not as crucial to the child’s development as is the relationship with the primary attachment figure. The Court acknowledges the child’s relationships with her extended paternal family and with her maternal grandmother, but finds that these relationships are not significant attachments.
Mr. LaGraize contends that the trial court failed to acknowledge that Ms. Fil-son has had complete control over VLF giving him limited visitation rights. He argues that both experts acknowledged the importance of the father/child relationship to a child’s development. The court also minimized VLF’s relationship with Mr. La-Graize’s extended family by calling it “not as crucial” and “not significant.”
Ms. Filson points out that she always encouraged contact between VLF and her father. During his paternity leave, Mr. LaGraize only spent a few hours with VLF during the day and went out with his friends at night. Although he was never prohibited from seeing VLF, he visited only 18.5 days from January through March 2014.
In June 2014, the parties entered into a mediation agreement setting forth a temporary visitation schedule until the court could make a final determination. Ms. Filson asserts that Mr. LaGraize would often arrive late or leave early. He |iSrefused to enter her home and waited outside while VLF was fed and changed. Despite this behavior and the mediation agreement, she routinely acquiesced to Mr. *1056 LaGraize’s requests for more unsupervised visitation.
After reading the testimony at trial, we cannot say that the trial court abused its discretion by finding factor 1 in Ms. Fil-son’s favor. The court saw and evaluated the truthfulness of the witnesses. The court was troubled by Mr. LaGraize’s credibility finding it “questionable.” Therefore, the court believed Ms. Filson’s testimony that she did not restrict Mr. LaGraize’s time with his daughter and that he agreed to a visitation schedule that he now argues is unfair.
While the record reflects that Mr. La-Graize has a close and loving relationship with VLF, her mother is the primary caregiver and primary attachment. We sympathize with Mr. LaGraize and understand that the separation will adversely impact his relationship with his child to some degree; this, however, does not rise to an abuse of discretion. This assignment of error is without merit.
Factor 2 addresses the impact the relocation will have on VLF’s physical, educational, and emotional development. In this regard the trial court stated:
That the child’s separation from Mr. La-Graize will not necessarily result in a deleterious effect on the child; the separation may create an absence of potential benefit.
Mr. LaGraize states that the language used above demonstrates the trial court imposed a higher burden of proof on Mr. LaGraize and eliminated the burden of proving “best interest” by Ms. Filson. We do not interpret the trial court’s language that way. The weighing of all twelve factors determines the best interest of VLF. Here, we are simply looking at the impact the separation will have on the father/child relationship. What the trial court is saying is that the separation will |1snot harm VLF, but prevent the potential benefits of consistent contact with her father.
Ms. Filson testified that this was a good time for her to pursue the degree in Italy since VLF’s schooling will not be interrupted. It will also give VLF an opportunity to learn a second language, a benefit in her future education. Obviously, the trial court weighed the factors, finding this factor in favor of the mother. Again, we find no abuse of discretion.
Factor 3 discusses the feasibility of preserving a good relationship between the non-relocating parent and the child. Dr. Pellegrin stated that she had conferred with VLF’s pediatrician; both concluded that the regular use of telephone calls and Skype can properly preserve the relationship between Mr. LaGraize and his daughter during the relocation period. The pediatrician stated that she has numerous patients with parents in the military who routinely and effectively used Skype to maintain a relationship with the separated parent. Dr. Pellegrin testified that this contact would be sufficient as long as it was fostered by the mother; Ms. Filson stated that she was committed to do whatever was necessary to preserve the relationship between father and child.
On the other hand, Ms. Ruel testified that daily or every other day contact between father and child was preferable. In addition, Mr. LaGraize argues that the trial court failed to take into account a fourteen-month old’s lack of ability to communicate via telephone and Skype. Both experts agreed that attachment bonds form through regular and consistent physical contact and caregiving in children under three.
While communication by telephone and Skype are far inferior to in-person contact, we agree with the trial court that a system could be set up that would allow | ?,nVLF to maintain contact with her father and keep her familiar with his face and voice. We also note that, contrary to the cases relied *1057 on by Mr. LaGraize, this is a temporary relocation. The second judgment, which sets out the communication and visitation schedule and will be discussed infra, is geared towards maintaining that relationship. Will it suffer some setbacks? Certainly. However, this does not in and of itself invalidate the relocation plan.
Mr. LaGraize argues that the remaining factors are neutral or weigh against relocation. We are not required to analyze- each and every one. In factor 6, the court determines how relocation will generally affect the quality of life for VLF, including, but not limited, to financial or emotional benefit and educational opportunity. Here, the trial court found that relocation will significantly improve VLF’s quality of life by exposure to another culture, the bilingual opportunities and, by increasing Ms. Filson’s earning potential. We agree and find no abuse of discretion by the trial court in making these findings.
We empathize with Mr. LaGraize’s position, but we also note that the relocation is for but three, albeit important, years of VLF’s life.[4] Reviewing the record in its entirety and placing great weight on the trial court’s findings of fact, we find the trial court properly permitted the relocation.
 In his second assignment of error, Mr. LaGraize argues that the trial court erred by setting up a custody and visitation arrangement for only one year but contains no provision for reevaluating the situation either through a mediator or by returning to court. As a result, he asks that we remand the matter with instructions' to address the remainder of the relocation period after the summer of 2015, a date |21that is not too far away. We begin with the proposition that a court’s establishment or modification of custody is entitled to great weight and will not be reversed on appeal unless an abuse of discretion is clearly shown. Thompson v. Thompson, 532 So.2d 101, 101 (La.1988). We also note that custody and visitation is always subject to modification by the court upon the appropriate showing and according to the best interests of the child. Lawrence v. Lawrence, 49,373, p. 7 (La.App. 2 Cir. 8/13/14), 147 So.3d 821, 826.
However, we do agree that a continuation and/or modification of the current custody and visitation schedule -will be needed no later than 14 September 2015, the date on which Mr. LaGraize must return VLF to Ms. Filson.
Finally, Mr. LaGraize contends that the judgment gives him less contact when VLF is with her mother than it gives to Ms. Filson when VLF is with her father. This appears true. When Mr. LaGraize has VLF, he must initiate contact between her and her mother once a day, every day. However, when Ms. Filson has VLF in Italy, “Ms. Filson shall make the child available on weekdays for telephone/Face-Time or Skype contact between the hours of 11:00 a.m. and 1:00 p.m. C.S.T.,” with Mr. LaGraize making contact. Further, when the child is in Italy, Ms. Filson “shall ensure that VLF participates in videoconferencing (either via FaceTime or Skype) with Mr. LaGraize no fewer than three times a week.”
We note the inequity. Mr. LaGraize should have the ability to communicate with his child while she is in Ms. Filson’s custody once a day, every day, a schedule equal to Ms. Filson’s. Therefore, we set aside that portion of the 7 October 2014 judgment for further proceedings. This will also give the trial court the opportunity to reevaluate the current plan; it can then modify and/or extend the custody and visitation schedule for VLF and her parents for the remaining two | ¡¡¿years of the *1058 fellowship or for one year with plans to revisit the matter in the summer of 2016.
VII.
Based on the foregoing, we affirm the judgment of September 2014. With regard to the judgment of October 2014, we reverse and set aside the two paragraphs at the end of the judgment that set up the telephone/FaceTime/Skype schedule between the parents and VLF with instructions to the court to make these communications daily, regardless of which parent has custody of VLF. We also instruct the court to hold a hearing to evaluate the custody and visitation arrangement that ends on 14 September 2015, at which time the arrangement will be modified and/or extended for the remaining two years of the fellowship in Italy or for one year with plans to revisit the arrangement again in the summer of 2016.

AFFIRMED IN PART; REVERSED IN PART; REMANDED.

. During the trial, Mr. LaGraize admitted that Ms. Filson never said that she was going to relocate and had always maintained that she was only going on a trip.

. Skype is a software application for telecommunications that utilizes the Internet to provide, inter alia, voice calls to and from computers, tablets, and mobile devices to other devices such as smartphones.

. The second judgment complained of will be covered infra.

. At this time, almost one year of the three-year program has been completed.