974 So.2d 726 (2007)
Emilie Wiltz McLAIN,
v.
Michael Christian McLAIN, Sr.
No. 2007-CA-0752.
Court of Appeal of Louisiana, Fourth Circuit.
December 12, 2007.
*727 Theon A. Wilson, Law Offices Of Theon A. Wilson, New Orleans, LA, for Plaintiff/Appellant.
Lisa C. Matthews, Maria I. O'Byrne Stephenson, Catherine I. Chavarri, Kathleen D. Lambert, Laurie E. Heinrich, Stephenson, Matthews, Chavarri & Lambert, L.L.C., New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge MAX N. TOBIAS, JR., Judge DAVID S. GORBATY).
PATRICIA RIVET MURRAY, Judge.
This is a child relocation dispute under La. R.S. 9:355.1-9:355.17. Emilie Wiltz McLain appeals the trial court's judgment ordering her to return her two minor children to New Orleans, Louisiana, from Tuscaloosa, Alabama, where she ultimately relocated with the children in the aftermath of Hurricane Katrina. Mrs. McLain additionally appeals the trial court's designation of her former husband, Michael McLain, Sr., as the interim primary domiciliary parent. Finding no abuse of discretion, in the trial court's judgment, we affirm.

FACTUAL AND LEGAL BACKGROUND
On February 18, 1995, Mr. and Mrs. McLain were married in New Orleans. Two children were born of the marriage: Michael Christian McLain, Jr. ("Christian"), born on September 21, 1995, and Madeleine McLain ("Maddie"), born on January 28, 1997. From the time they were married until August 29, 2005, when Hurricane Katrina struck, the parties resided in the uptown area of New Orleans.[1] Since 1997, Mr. McLain has been employed as a salesman for a food supply company located in the New Orleans area. Mrs. McLain, who has a master's degree, is a music educator with twenty-three years of teaching experience. She has worked in several schools in the New Orleans area; and she has taught at the elementary, secondary, and college level. She also has operated a private piano and voice lesson business.
On August 27, 2004, Mrs. McLain filed a petition for divorce. On November 15, 2004, Mr. and Mrs. McLain separated.[2] When they separated, Mrs. McLain moved into an apartment across the street from the family home. Mr. McLain continued to reside in the family home. In June 2005, Mr. McLain moved into an apartment located in the Lusher School District and a few blocks away from Lusher School. Shortly thereafter (and before Hurricane Katrina struck the area), the parties sold the family home.
During the period of their separation, Mr. and Mrs. McLain mutually agreed on the custody of the children; however, they never obtained judicial approval of their agreement. Under that agreement, Mrs. McLain was the de facto primary domiciliary *728 parent, and Mr. McLain had visitation on Wednesday evenings and every other weekend. Beginning in mid-June 2005, Mr. McLain's Wednesday visitation was extended to include the children staying overnight. Since November 2004 when they separated, Mr. McLain has voluntarily paid child support to Mrs. McLain at an amount consistent with the Louisiana child support guidelines.[3]
During the 2004-2005 school year, the children attended St. Andrew's Episcopal School in New Orleans. Even before the separation, Mr. and Mrs. McLain had difficulty affording the tuition; they borrowed money from Mr.McLain's mother to pay the tuition. Following the separation, Mr. McLain expressed his concern that given their current circumstanceshaving to maintain two separate householdsthey could not afford to send the children to St. Andrew's for the 2005-2006 school year. He proposed to send the children to Lusher. Mrs. McLain, however, insisted that the children remain at St. Andrew's for another year. She expressed her belief that the children had undergone significant changestheir parents separating and both parents moving to new homesand that they should not have to also change schools. Ultimately, Mr. and Mrs. McLain agreed that the children would attend St. Andrew's for the 2005-2006 school year and that the tuition for that year would be paid out of the proceeds of the sale of their family home. They also agreed to revisit the issue of which school the children would attend when it was time to register for the 2006-2007 school year. At the time Hurricane Katrina struck the New Orleans area, the children had attended the first few days of school at St. Andrew's.
Because Mr. McLain had the children for the weekend that the hurricane struck, he and the children, with Mrs. McLain's consent, evacuated to his mother's home in San Antonio, Texas. At that time, Mr. McLain investigated the potential schools in San Antonio that the children could attend.
Mrs. McLain, on the other hand, could not evacuate to her parents' home in Biloxi, Mississippi, because Biloxi was also within the projected path of the hurricane. Since she did not have reliable transportation, Mrs. McLain evacuated with friendsAaron Neville's wife, daughter, and nephewto Tuscaloosa, Alabama. Tuscaloosa was chosen because a friend of the Neville family, Fred Deloach, had secured hotel rooms there.[4]
During the first week in September 2005, Mrs. McLain and the children, with Mr. McLain's consent,[5] relocated to O'Fallon, Illinois to stay with her sister. Mrs. McLain's reason for relocating to O'Fallon was that the support of the children's aunt, uncle, and cousins was important to the children's emotional well-being following Hurricane Katrina. By e-mail dated September 3,2005, Mrs. McLain characterized this relocation as "temporary" and stated *729 that she hoped to return to New Orleans within a few months. A few days later, the children flew directly from San Antonio to St. Louis, where Mrs. McLain met them. On the next day, the children were enrolled at the same elementary school that their cousins attended in O'Fallon.
On September 11, 2005, Mrs. McLain sent Mr. McLain an e-mail that the children were adjusting well to their new home and school environment in O'Fallon. She further informed him that she had applied for a substitute teaching job. She still further informed him that her parents had returned to their home in Biloxi over the weekend and that there was "no major damage to their home." On September 15, 2005, Mrs. McLain again e-mailed Mr. McLain and informed him that everything was going well in O'Fallon. She indicated that the kids were settling into a routine and that they were doing well academically and socially. She further indicated that she had unsuccessfully attempted to log onto the St. Andrew's school website. On September 15, 2005, Mr. McLain sent Mrs. McLain an e-mail updating her on his status in New Orleans. He stated that he was still employed and that St. Andrew's might re-open by November. During the last week of September, Mr. McLain visited with the children in O'Fallon to celebrate Christian's birthday.
During the first week in October, Mrs. McLain returned to New Orleans to check on her apartment. She found out that the roof had blown off of her home, and she was informed that she had one week to relocate. Mrs. McLain testified that she considered Biloxi, which was where the children were staying with their grandpareats while she was in New Orleans, but she ruled out Biloxi as a possibility for two reasons. First, several of her family members who had extensive damage to their homes were staying at her parents' home and thus there was no room. Second, the schools in Biloxi were not open.
During the weekend that the children were staying with Mrs. McLain's parents in Biloxi, Mr. McLain had supper with them. At that time, the children mentioned that they were possibly moving to Tuscaloosa, Alabama. Mrs. Neville attested that when she returned to New Orleans after Hurricane Katrina she observed a moving truck in front of Mrs. McLain's home, and she saw Mr. Deloach and others helping Mrs. McLain move her belongs. Mrs. Neville attested that she spoke with Mrs. McLain, and Mrs. McLain told her that she was moving to Tuscaloosa.
At some point between the end of September and the beginning of October 2005, Mrs. McLain, without Mr. McLain's consent, decided to relocate with the children to Tuscaloosa, Alabama. At that time, Mrs. McLain did not have any employment in Tuscaloosa and the only person she knew there was Mr. Deloach.[6] During this time, Mrs. McLain failed to communicate with Mr. McLain despite his numerous efforts to reach her, which included leaving messages with her parents in Biloxi, on her moving truck that was parked in front of her apartment in New Orleans, and as a last resort with the children. During this move, there was a brief break in time when the children were not in school. There was also a period of time when Mr. *730 McLain was unaware of where the children were living or attending school.
On October 10, 2005, Mr. McLain emailed Mrs. McLain regarding her lack of communication with him for the prior five days. On October 30, 2005, Mrs. McLain provided contact information to Mr. McLain regarding their new address in Tuscaloosa and the children's school there. Mrs. McLain signed a nine month lease.
On March 16, 2006, Mrs. McLain emailed Mr. McLain proposing that the children be allowed to remain in Tuscaloosa for the upcoming 2006-2007 school year. On that same date, Mr. McLain filed a Rule to Show. Cause Why Divorce Should Not Be Granted Under La. C.C. art. 102; Rule for Custody and Motion for Custody Evaluation; Ex Parte Motion to Set Deadline for Filing Detailed Descriptive Lists. This was the first pleading filed in the divorce case since Mrs. McLain initiated the proceeding by filing a divorce petition in 2004. In his post-trial memorandum, Mr. McLain explained that the reason he delayed seeking judicial relief regarding Mrs. McLain's failure to comply with the relocation statutory provisions was that he did not want to disrupt the children's school placement in November 2005 after they had attended three different schools in a matter of weeks.
In his pleadings, Mr. McLain summarized the post-Hurricane Katrina events that precipitated his seeking judicial relief as follows:
After moving to Alabama with the children [in early October 2005], Mother enrolled them in school and did not return to New Orleans, even though the children's school in New Orleans [St. Andrew's] reopened on November 2, 2005, and the school where Mother was employed reopened on November 11, 2005. Mother stated she would not make any decisions about when she would return to New Orleans until after the 2005-2006 school year. Most recently, Mother has stated that she would not make any decisions about returning to New Orleans or which school the children might attend until August of 2006.
Mother has not sent Father notice of any intention to relocate permanently to Tuscaloosa, Alabama with the minor children of the marriage in accordance with La. R.S. 9:355.1, et seq., nor has she stated whether she intends to remain there indefinitely. However, she has failed and refused to return the minor children to live in New Orleans, which has interfered with the parenting schedule the parties had been following prior to Hurricane Katrina, and which has unduly delayed the children's return to their home and community following Hurricane Katrina. Moreover, Mother has remained uncommunicative and unresponsive on multiple attempts from the Father to arrange visitation or follow previous arrangements regarding the children.
Mother does not and did not have employment in any of the two locations [(i.e., O'Fallon, Illinois or Tuscaloosa, Alabama)] she brought the children to live after Hurricane Katrina. The only reason Mother brought the minor children to Tuscaloosa, Alabama to live was so that she could thwart the minor children's relationship with Father and so that she could be close to her boyfriend who lives in Tuscaloosa, Alabama, Mr. Deloach.
Father returned to live in New Orleans on September 15, 2005, where he has remained since them.
In April 2006, the parties were divorced, and a consent judgment was prepared by the parties. In the consent judgment, the parties agreed that Alicia Pellegrin, Ph.D., *731 would be the court-appointed independent custody evaluator and that all appointments needed to complete the evaluation would be scheduled on or before June 1, 2006. Mrs. McLain, however, did not have her final interview with Dr. Pellegrin until August 3, 2006.
On July 20, 2006, Mr. McLain filed a Rule to Show Cause Why Children Should Not Be Returned to New Orleans. On September 18, 2006, a hearing was held on Mr. McLain's rule. At the hearing, four witnesses testified: (i) Mrs. McLain; (ii) Mr. McLain; (iii) Nancy Marshall, a member of St. Andrew's Church; and (iv) Kristen Bryant, the youth director at St. Andrew's Church. Dr. Pellegrin's report was introduced by the trial court, on its own motion, and her deposition was introduced by Mr. McLain. Mr. McLain also introduced affidavits of Mrs. Neville and Reverend Susan Gaumer, the rector at St. Andrew's Church. Various e-mails exchanged between Mr. and Mrs. McLain during the pertinent period of time also were introduced. Mr. McLain also introduced correspondence from the principal of Lusher Charter School. The letter indicated that the reserved places for the children at Lusher would no longer be available if the children were not physically present at school by October 20, 2006. Both parties also introduced evidence regarding the schools, in general, and the children's performance in school, in particular, as well as their participation in other activities. Mrs. McLain also introduced evidence regarding her employment in Tuscaloosa, which included a part-time teaching job, various free-lance jobs, and teaching private music lessons.
On October 9, 2006, the trial court rendered judgment. The judgment ordered the return of the children to New Orleans in sufficient time to timely enroll at Lusher Charter School.[7] The judgment further provided for interim custody to be joint with Mr. McLain as primary domiciliary parent and with Mrs. McLain to have liberal, reasonable and possible visitation. The judgment still further provided that upon Mrs. McLain's return to the greater New Orleans metropolitan area, either party could seek a review of the interim custody if not sooner modified by their mutual agreement in writing. Mrs. McLain filed a motion for a stay of the enforcement of the judgment and a motion for new trial. The trial court summarily denied the request for a stay; it denied the motion for new trial after a hearing. This appeal followed.[8]

DISCUSSION
The standard of review in a relocation case is that the trial court's determination "will not be overturned absent a clear showing of abuse of discretion." Curole v. Curole, 02-1891, p. 4 (La.10/15/02), 828 So.2d 1094, 1096. In reviewing the record to determine whether the trial court's ultimate conclusion constitutes an abuse of discretion, the appellate court must accept each factual finding the trial court made in arriving at that conclusion, unless the particular factual finding is manifestly erroneous. H.S.C. v. C.E.C., 05-1490, p. 1. (La.App. 4 Cir. 11/8/06), 944 *732 So.2d 738, 750 (Murray, J., concurring) (citing Curole, supra); see also Leaf v. Leaf 05-0592 (La.App. 4 Cir. 3/2/06), 929 So.2d 131.
As the trial court noted in its written reasons for judgment, La. R.S. 9:355.1 through 9:355.17 govern the issue of the relocation of a child's residence out of state. Relocation is defined to include an "[i]ntent to establish legal residence with the child at any location outside of the state." La. R.S. 9:355.1(4)(a). The Louisiana Legislature has placed a two-fold burden of proof on the relocating parent, who must prove that (i) the proposed relocation is made in good faith, and (ii) is in the best interest of the child. La. R.S. 9:355.13. Guidance to the trial court in making its determination as to whether the relocating party has met this burden of proof is provided by La. R.S. 9:355.12, which lists a dozen factors the trial court is required to consider in reaching its decision regarding a proposed relocation.[9] The Legislature has also instructed that in making this determination "[t]he court may not consider whether or not the person seeking relocation of the child will relocate without the child if relocation is denied or whether or not the person opposing relocation will also relocate if relocation is allowed." La. R.S. 9:355.12(B). "If the issue of relocation is presented at the initial hearing to determine custody of and visitation with a child, the court shall apply the factors set forth in R.S. 9:355.12 in making its initial determination." La. R.S. 9:355.15.
On appeal, Mrs. McLain first assignment of error is that the trial court erred in making a custody determination considering that only the Rule to Show Cause Why Children Should Not Be Returned to New Orleans was set for hearing before the court. Mr. McLain counters that this is a non-issue.
In its reasons for judgment, the trial court addressed this issue and noted that *733 "the true issue before the court was whether or not the children would be ordered to return to New Orleans or continue de facto relocation to Tuscaloosa, Alabama without prior notice to Mr. McLain or a court hearing." The court further noted that it "considered the hearing to be one of allowing or denying relocation of the minor children." Explaining the inclusion in the judgment of the provision designating Mr. McLain as the interim primary domiciliary parent, the trial court stated that this provision was simply the practical result of its ruling on the relocation issue. At the hearing on the motion for new trial, the trial court reiterated the practical reason for including this provision in the judgment, stating:
"I just don't think it makes sense for the children to be here, for Daddy [Mr. McLain] to be here, for Mrs. McLain to be in Tuscaloosa, Alabama and then we're going to argue about who's the primary domiciliary parent? I can answer that question for you as a practical matter: The parent that's here. If she returns, I am willing to change that immediately."
The practical impact of a trial court's decision denying relocation on the de facto custody of the children has been noted by the commentators. "[I]f a custodial parent is judicially prohibited from relocating the child, a de facto change of custody will occur if the custodial parent has no choice but to move and therefore has to leave the child in Louisiana with the non-relocating parent to serve as custodian of the child." Laura C. Cocus, Comment, Louisiana's Restrictive Relocation Laws: Jeopardizing Stability in Custodial Arrangements for the Sake of Geographical Proximity Between Divorced Parents, 53 Loy. L.Rev. 79, 86 (Spring 2007) ("Cocus"). The trial court's judgment in this ease simply acknowledges that de facto change in custody results from its ruling on the relocation issue. We find no error in the trial court's express recognition of the practical impact of its denial of relocation.
Mrs. McLain's alternative argument is that the trial court's award of domiciliary custody is not based on the law and is contrary to the evidence. She points out that La. C.C. art. 131 requires the court to award custody in the best interest of the children, and La. C.C. art. 134 enumerates the factors the court should consider in making the best interest determination. Mrs. McLain argues that the only best interest analysis the trial court engaged in involved the dozen relocation factors enumerated in La. R.S. 9:355.12.
Because this case involves an interim initial custody order, the requirements of Article 131 and 134 arguably are not applicable. Regardless, because this case involves not only a custody issue but also a relocation issue, the particular provision that governs this case is La. R.S. 9:355.15, which provides that when the relocation issue is presented at the initial hearing to determine custody and visitation, the court shall apply the relocation factors set forth in La. R.S. 9:355.12 in making its initial determination. See Walkowiak v. Walkowiak, 32,615, p. 5 (La.App. 2 Cir. 12/8/99), 749 So.2d 855, 858. Moreover, as the Louisiana Supreme Court noted in Curole, the fundamental principle governing decisions under the Louisiana relocation statute is the "best interest of the child" standard. Curole, 02-1891 at p. 4, 828 So.2d at 1096; see also Rao v. Rao, 05-1523 (La.App. 1 Cir. 11/4/05), 927 So.2d 391 (finding jurisprudential change of custody standards inherent in the relocation factors and requirements of good faith and best interests of the children under La. R.S. 9:355.12 and 9:355.13).
*734 Mrs. McLain's argument that the trial court factually erred in awarding primary domiciliary custody to Mr. McLain is based on Dr. Pellegrin's opinion that regardless of where the children reside she should be designated as the primary domiciliary parent. Dr. Pellegrin based this recommendation on the fact that Mrs. McLain has been the parent "who was accustomed to taking care of the children's daily needs." Dr. Pellegrin, however, expressly states in her report that she is not rendering an opinion on the relocation issue, which was the only matter before the trial court. As Mr. McLain points out, Dr. Pellegrin's opinion did not contemplate that Mrs. McLain would not return to New Orleans if the court denied the relocation. Moreover, Dr. Pellegrin testified in her deposition that if the court orders the children returned to New Orleans and Mrs. McLain chooses not to relocate, she believes that Mr. McLain would be able to be the designated domiciliary parent and provide for the children's needs. We thus find no error in the trial court's interim custody award.
Mrs. McLain's next two assignments of error relate to the trial court's finding that she failed to satisfy her burden of proving the relocation was in good faith. She correctly notes that the statute does not define good faith and offers several definitions of that term, including an absence of intent to defraud or seek an unconscionable advantage. However, the jurisprudence has defined the meaning of the term good faith in this context as a legitimate or valid reason for the move. See Johnson v. Johnson, 99-1933, p. 5 (La.App. 3 Cir. 4/19/00), 759 So.2d 257, 259. "Relocations that are based on a frivolous reason, no reason, or just to interfere with the non-custodial parent's visitation with the children" do not satisfy the good faith requirement. Cocus, 53 Loy. L.Rev. at 98 (citing Janet L. Richards, Children's Rights v. Parents' Rights: A Proposed Solution to the Custodial Relocation Conundrum, 29 N.M. L.Rev. 245, 263 (Spring 1999)). Legitimate reasons include:
(i) to be close to significant family or other support networks;
(ii) for significant health reasons;
(iii) to protect the safety of the child or another member of the child's household from a significant risk of harm;
(iv) to pursue a significant employment or educational opportunity; or
(v) to be with one's spouse (or equivalent) who is established, or who is pursuing a significant employment or educational opportunity, in another location.
Richards, 29 N.M. L.Rev. at 263 n. 102 (citing American Law Institute's Tentative Draft on Relocation); see also Dupre v. Dupre, 857 A.2d 242, 258-59 (R.I.2004) (citing these factors and noting that "[a] parent's desire to relocate with his or her children ought not be predicated upon a whim.")
At the hearing in this case, the trial court questioned Mrs. McLain regarding her reason for relocating to Tuscaloosa. The court asked her if Mr. Deloach had not been in Tuscaloosa would she have gone there, and she answered that she definitely would have considered it. She stated: "I was there for 10 days during the storm, I saw what it had to offer and I knew it was closer to home than Illinois."[10] Ultimately, the trial court found that Mrs. McLain's relocation and desire to continue *735 indefinitely the relocation to Tuscaloosa, Alabama, was not made in good faith for the following reasons:
Mother did not notify Father of her move from O'Fallon, Illinois to Tuscaloosa, Alabama nor of her intention to remain in Tuscaloosa.
The move did not increase Mother's income because she had not had nor did she have full time permanent employment at the time of trial.
The court accepts Mother's testimony as to the quality of the children's schools in Tuscaloosa but also notes that St. Andrew's where the children attended school reopened on November 2, 2005, and Ecole Bilingue de la Novelle, where mother worked prior to Katrina reopened on October 11, 2005.
Further, the only person that Mother knew in Tuscaloosa, Alabama, prior to relocating there was Fred Deloach. The nature and extent of Mother's relationship with Mr. Deloach is not clear on this record.
To the extent that Mother's quality of life is enhanced by being near to Mr. Deloach, it does not compensate the children's loss of frequent and continued contact with their father.
Also, Tuscaloosa places the children a greater distance from their maternal and paternal grandparents. It should also be noted that the maternal grandparents had returned to their Biloxi home contrary to the representation made by Mother to Dr. Alicia Pell grin.
The trial court also noted its belief that there is a temporal requirement in any good faith request to relocate, i.e., the reasons for the requested relocation must exist prior to the proposed or actual relocation. In finding the requirement was not met in this case, the court reasoned that "it appears that the only fact known about Tuscaloosa prior to the relocation was that Fred Deloach lived there."
Mrs. McLain contends that the trial court's finding on this issue was both legally and factually erroneous. Legally, she contends the trial court erred in focusing only on where as opposed to why she relocated. She contends that the relocation statute is not location-specific and that it is the move itself and not the place that should be the focus of the good faith analysis. She emphasizes that her, initial move from New Orleans was involuntary due to Hurricane Katrina and that in the aftermath of the hurricane her options in terms of employment, housing, and schooling for the children were limited. She further emphasizes the lack of evidence that her relocation to Tuscaloosa was malicious, fraudulent, or otherwise intended to gain an unjust advantage over Mr. McLain.
The jurisprudential requirement of good faith simply refers to a legitimate or valid reason for the move. In this case, Mrs. McLain's primary reason for moving to Tuscaloosa was that her friend, Mr. Deloach, lived there. We cannot say that the trial court's finding that this was not a good faith reason to relocate was manifestly erroneous. Ordinarily, this would require we affirm the trial court's decision. However, we find it appropriate in deciding this case to review the factors enumerated in La. R.S. 9:355.12 because this case differs from the ordinary relocation dispute in two significant respects.
Ordinarily, the relocation issue arises after the initial custody determination has been made. Cocus, 53 Loy. L.Rev. 79, 86. This case, however, is different in that an initial custody determination was never made. Rather, before Hurricane Katrina, the parties had a de facto custody agreement. As discussed above, given the lack of any court order regulating custody between the parties at the time of the relocation *736 at issue, this case falls under La. R.S. 9:355.15, which requires the court to apply the relocation factors in La. R.S. 9:355.12 in making its initial custody determination.
The second aspect in which this ease is different is that it involves an initial involuntary relocation from the New Orleans area as a result of the emergency presented by Hurricane Katrina. As a commentator has noted, "lain emergency evacuation does not itself constitute a relocation, but if the parent who evacuated with the child does not plan on returning, relocation will become an issue." Steven J. Lane, Jurisdictional and Practical Problems in Family Law Following Hurricane Katrina, 69 Tex. B.J. 438, 441 (May 2006). As this commentator points out, the issue is at what point does the emergency evacuation transform into a relocation., Id.
Before addressing the factors enumerated in La. R.S. 9:355.12, we first address Mrs. McLain's argument that the trial court erred in adopting Mr. McLain's argument from his post-trial memorandum and failing to undertake its own independent analysis of the twelve relocation factors. We find, as Mr. McLain contends, that there was no error in the trial court's adopting the analysis presented by Mr. McLain. In so finding, we note that the statute provides that the trial court "shall consider" the factors, not that the trial court must expressly analyze each factor. See H.S.C., 05-1490 at p. 2, 944 So.2d at 751-52 (Murray, J., concurring). We now turn to an analysis of the twelve relocation factors.
(1) The nature, quality, extent of involvement, and duration of the child's relationship with the parent proposing to relocate and with the nonrelocating parent, siblings, and other significant persons in the child's life.
This factor requires an assessment of the relationship between the children and each of the parents. This is a case involving two equally suited parents. Dr. Pellerin testified that the nature, quality, and duration of the children's relationship with Mr. McLain were similar to that as exhibited with Mrs. McLain. She characterized all of these as positive factors as to Mr. McLain and described his relationship with the children as excellent. She also stated that he has been a very involved father who has been there since the children were born. She concluded that there was nothing negative relative to either parent as to this factor.
Mr. McLain testified regarding the activities he previously engaged in with his children. He stated that he was an assistant coach for Christian's basketball team and for Maddie's soccer team, regularly attended the children's sporting events, regularly took them to church and choir practice at St. Andrew's, took them to the park to ride bikes, and cooked dinner for them. He further testified that his work schedule is from 8:00 a.m. to 5:00 or 6:00 p.m. on Monday to Friday, but he does not have set work hours. He explained that he has a great deal of flexibility in his work schedule and that he can bring the children to the office if he needs to do so.
Mrs. Neville attested in her affidavit that both Mr. and Mrs. McLain are equally excellent, loving, capable, and involved parents. She further attested that the children are equally bonded to both parents and that they enjoy a very close and loving relationship with both parents. She characterized Mr. McLain as a "hands-on" father who frequently takes his children to church and to sing in the choir. She likewise described Mrs. McLain as a loving and involved parent. Mrs. Neville also attested that she would trust either Mr. or Mrs. McLain with the care of her daughter, *737 who is Maddie's friend. Mrs. Neville described the activities that Mr. McLain planned for the children and in which he included her daughter. These activities included a well-planned birthday party that Mr. McLain hosted for Maddie in Audubon Park after Hurricane Katrina.
Reverend Gaumer attested that she has been the rector at St. Andrew's Church for over seven years. In that capacity, she has become acquainted with the McLains, who have been parishioners there. She indicated that the children "seemed to be equally happy with both parents." She further indicated that she has not had any contact with Mrs. McLain since the hurricane, but she has had contact with Mr. McLain and the children. She characterized Mr. McLain, both before and after Hurricane Katrina, as an excellent parent who has a very strong bond with his children.
Ms. Marshall, a friend of the McLains, testified about her personal observations of the close and loving relationship the children have with their father. She testified that she sees the children with Mr. McLain at church and other activities and that the children have a lovely relationship with their father. She stated that "he does all kinds of things with them."
The other significant influences in the children's lives include their church and school communities. Mrs. McLain acknowledged that the children have a strong sentiment towards their church here in New Orleans and still love their church family. Several members of St. Andrew's Church also testified regarding the children's strong bond with their church. The youth group director, Mrs. Bryant, testified that the children joined the group after they relocated to Tuscaloosa and that the children have participated in the group activities as much as they could given the distance between New Orleans and Tuscaloosa. She testified that she communicates with Christian regarding group activities by e-mail. (Copies of the e-mails were introduced into evidence.)
Dr. Pellegrin's response regarding the other significant persons in the children's lives when they initially moved to Tuscaloosa was that "certainly their home was New Orleans. Their community was New Orleans. They didn't know anyone in Tuscaloosa at the time they relocated so New Orleans by default would have to become out ahead there."
(2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child.
At the time of the trial court proceedings, Maddie was nine years old and Christian was almost eleven years old.[11] Dr. Pellegrin testified that the children could do well in New Orleans as it is their home. However, she testified that some weight had to be given to the fact the children were "ensconced"securely or comfortably settledin the Tuscaloosa community and in school there. They had developed a social network there. She also stated her belief that the children had been moved around a lot and that developmentally and emotionally another move would be difficult, especially for Maddie. However, she acknowledged the need to balance the difficulty of another move with the distance from their father. She also acknowledged that the children have been moved a lot *738 because of decisions made by Mrs. McLain. Dr. Pellegrin indicated that it is a difficult call to make.
The record reflects that Mr. McLain was active on a regular basis in the children's extracurricular and church activities and that he could not participate regularly in those activities if the children remained in Tuscaloosa. Dr. Pellegrin stated that this inability of Mr. McLain to participate in a meaningful fashion in the children's lives if they remain in Tuscaloosa would have an impact on their physical, educational, and emotional development to some extent.
The evidence indicates that the children have equally excellent educational, social, and spiritual opportunities in Tuscaloosa and in New Orleans. The record reflects that Lusher Charter School and the public school the children were attending in Tuscaloosa are on par. New Orleans is where they have lived their entire lives pre-Hurricane Katrina and many of their church and school friends are here. Moreover, Mr. McLain is here.
(3) The feasibility of preserving a good relationship between the nonrelocating parent and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.
Dr. Pellegrin testified that the quality of the father-child relationship if the children remain in Tuscaloosa cannot even approach what it would be if the children lived in the same city as their father. She testified that "it's impossible."
Mr. McLain testified that he has only visited the children two or three times since they relocated to Tuscaloosa for two reasons: (i) the time factor of traveling there, and (ii) the cost factor. He testified that it is approximately a five hour drive from New Orleans each way and that it is impossible to spend quality time with the children on a weekend without staying in Tuscaloosa. He further testified that he lacks the financial resources to spend time with the children in Tuscaloosa very often. Although he acknowledged that Mrs. McLain invited him to stay in her home when he visited, Mr. McLain testified that he was uncomfortable accepting the invitation.
(4)The child's preference, taking into consideration the age and maturity of the child.
Although the children expressed a preference to remain in Tuscaloosa, Dr. Pellegrin testified that "[i]t's very difficult to know at this age and given the circumstances how much of it is what they really want and how much of it is because of the reasons discussed that they should want." She further testified that the children obviously are very aware of what each parent wants and that the desire to please each parent often triggers what they say to each parent. She was not surprised that the children made statements to their father that they wanted to return to New Orleans.
In her report, Dr. Pellegrin noted that "both children reported that they feel `pressured' by their father to return to New Orleans, which is making them uncomfortable." Dr. Pellegrin also stated in her report that "both children are well aware of what each parent wants and this examiner believes that the children are citing their reasons for wanting to remain in Tuscaloosa by repeating what they have heard from their mother." She had some concern about the children parroting what their mother said regarding their preference. Dr. Pellegrin stated that when she interviewed Christian regarding his reason for wanting to remain in Tuscaloosa, his answer was that "everything in New Orleans is so depressing; I don't think I *739 could take it. It's less depressed in Tuscaloosa." However, Christian could not explain to her what he meant by the term "depressed," which he used several times.
Dr. Pellegrin acknowledged that it would be important to consider statements the children made to third parties outside the presence of their parents in determining their preference. She indicated that this would include statements made to a church youth director regarding the children's desire to return to New Orleans and to remain a part of their church community here.
(5) Whether there is an established pattern of conduct of the parent seeking the relocation, either to promote or thwart the relationship of the child and the nonrelocating party.
Dr. Pellegrin testified that she was not aware of any problem regarding this factor. Before Hurricane Katrina, the parties had agreed on a regular visitation schedule. Because the parties lived nearby each other, the children were able to see both parents on a regular basis. During that time, Mr. McLain was gradually increasing the visitation time he had with the children.
Dr. Pellegrin further testified that the evidence of Mrs. McLain's consistent efforts to ensure the children have frequent contact with their father belies Mr. McLain's belief that Mrs. McLain has attempted to thwart his relationship with the children. Although Mr. McLain testified that the children have only called him about four times during the time they have been in Tuscaloosa, there is no evidence to establish that Mrs. McLain has interfered with the communication, by telephone or otherwise, between the children and Mr. McLain. To the contrary, Mrs. McLain offered, at the suggestion of Dr. Pellegrin, to install a separate phone line in her house for the children. Mr. McLain, however, disapproved of the suggestion because he did not believe the children were old enough to have their own phone line. Mrs. McLain thus did not have the separate line installed.
Although Mrs. McLain has made efforts to facilitate Mr. McLain's visitation and communication with the children and even offered to allow him to stay at her house in Tuscaloosa, she made the unilateral decision to relocate the children from O'Failon to Tuscaloosa. She then failed to notify Mr. McLain of the new address and new school she selected for the children until after the fact.
(6) Whether the relocation of the child will enhance the general quality of life for both the custodial parent seeking the relocation and the child, including but not limited to financial or emotional benefit or educational opportunity.
Dr. Pellegrin testified that the children are able to have generally the same positive quality of life in Tuscaloosa and in New Orleans. Although Mrs. McLain testified that the children were afraid when they visited New Orleans after Hurricane Katrina, several witnesses corroborated Mr. McLain's testimony to the contrary. Mrs. Neville attested that she observed the children in New Orleans after. Hurricane Katrina and that she did not observe any anxiety or concern on their part over being back in New Orleans. Reverend Gaumer attested that on the occasions she has observed the children in New Orleans since Hurricane Katrina they seemed to really enjoy being back in New Orleans and being back in their church home. She stated that the children did not express or exhibit any fear or concern about being in New Orleans. Ms. Marshall testified that she did not observe anything in the children's demeanor to indicate they felt uncomfortable in New Orleans post-Hurricane Katrina. Rather, she testified that they appeared to be happy to be back. *740 Mrs. Bryan, the youth group director, also testified that the children were "absolutely not" in any fear about being back in New Orleans after Hurricane Katrina. She testified that they had a great time when they were in New Orleans.
(7) The reasons of each parent for seeking or opposing the relocation.
The reasons for Mrs. McLain's relocation to Tuscaloosa are detailed in the discussion on good faith. Mr. McLain's reason for opposing the relocation is that he wants to have regular contact with his children. He testified that he does not want, to be a visiting father. To the contrary, he testified that he wants to be the domiciliary parent. In support of his ability to do so, he cited the stability in his home, work, and financial life.
(8) The current employment and economic circumstances of each parent and whether or not the proposed relocation is necessary to improve the circumstances of the parent seeking relocation of the child.
As noted, Mr. McLain has been employed with the same company for nine years in the New Orleans area. Mrs. McLain, at the time of the hearing, had obtained a part time teaching job in Tuscaloosa, was operating a private music lessons business, and had done some other. free-lance work in Tuscaloosa.
(9) The extent to which the objecting parent has fulfilled his or her financial obligations to the parent seeking relocation, including child support, spousal support, and community property obligations.
Although there is no existing child or spousal support order, Mr. McLain has been paying child support to Mrs. McLain on a regular basis since their separation in an amount supported by the Louisiana child support guidelines. Dr. Pellegrin testified that she had no concerns regarding Mr. McLain's fulfilling his financial obligations. In this regard, she testified that he has paid regular child support, was not in arrears, and has participated financially in the major decisions.[12]
(10) The feasibility of a relocation by the objecting parent.
The objecting parent is Mr. McLain. Dr. Pellegrin testified that Mr. McLain has longstanding work in New Orleans and that he certainly could not be expected to pick up and move unless he had alternative employment available. Mr. McLain testified that he attempted to locate comparable employment in the Tuscaloosa area, but was unsuccessful. He explained that he researched the food service providers that operate in the Tuscaloosa area. The home office of the company that services that area is in Atlanta, Georgia. He stated that he would have to live in Atlanta if he was going to be a salesman in Tuscaloosa.
(11) Any history of substance abuse or violence by either parent, including a consideration of the severity of such conduct and the failure or success of any attempts at rehabilitation.
Dr. Pellegrin stated in her report that "[n]either party has any significant psychological or personality problems that would adversely affect their ability to parent adequately." She testified that the parties had a volatile relationship when *741 they were together, but she did not believe this was a domestic violence case. She further testified that Mr. McLain was diagnosed several years earlier with Bipolar Disorder,[13] but his condition is well managed and controlled. She stated she had no concerns about his condition at this point. She likewise testified that she had no serious concerns about Mrs. McLain's alleged alcohol abuse.

(12) Any other factors affecting the best interest of the child.
The only other factor Dr. Pellegrin identified was Maddie's relatively fragile emotional and psychological condition. As noted earlier, Dr. Pellegrin cited this factor as a concern regarding moving the children. She noted that Christian would have no problems adjusting, but another move could be difficult for Maddie. However, Dr. Pellegrin acknowledged that the potential adverse effects of moving Maddie again would have to be balanced against the potential adverse effects of having the distance between her and Mr. McLain. Counseling for Maddie was recommended. It was also noted that it would be important for Mr. McLain to be involved in the counseling program. Such involvement would be difficult if the counseling was in Tuscaloosa, and Mr. McLain was living in New Orleans.
In looking at the relocation factors, we find that the trial court's determination that the relocation to Tuscaloosa was not in the best interest of the children was not manifestly erroneous. Mrs. McLain failed to meet her burden at trial to justify the relocation. Accordingly, we conclude that the trial court did not abuse its discretion in denying the relocation.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] According to Mrs. McLain's testimony, they resided for about a year in Austin, Texas before they were married. She grew up in Mississippi; Mr. McLain grew up in Texas.
[2] Although Mr. and Mrs. McLain separated in 2001, they reunited shortly thereafter,
[3] Following Hurricane Katrina, Mr. McLain apparently missed or paid a reduced support payment for a couple of months. However; there was never a support judgment.
[4] The McLains and the Nevilles are close friends. Mr. Deloach, a longtime fan of Mr. Neville, often had backstage passes for Mr. Neville's performances. Mrs. Neville attested that "[t]o the best of my knowledge, based upon statements made to me by Emilie McLain prior to Hurricane Katrina, Emilie McLain and Fred Deloach did not have a serious relationship prior to Hurricane Katrina.
[5] Although he agreed to the move to O'Fallon, Mr. McLain voiced reservations about the move because of the "rocky relationship" between Mrs. McLain and her, sister. He was also concerned regarding his inability to visit the children on a regular basis.
[6] Although Mrs. McLain testified that she had other friends in Tuscaloosa, she was only able to identify two other people who she testified she knew through Mr. Deloach. Moreover, Dr. Pellegrin, the court-appointed custody evaluator, testified that she was unaware of anyone other than Mr. Deloach who Mrs. McLain knew in Tuscaloosa when she relocated there. Likewise, Mrs. Neville stated in her affidavit that the only person Mrs. McLain knew in Tuscaloosa when they evacuated there was Mr. Deloach.
[7] The judgment also provided that the children may continue their present enrollment in Tuscaloosa, Alabama through the end of the first quarter provided that date allows for sufficient travel and preparation time to enroll timely in Lusher.
[8] Although on November 2, 2006, the trial court granted Mrs. McLain's Motion for Expedited Appeal of Issues of Custody and Relocation, which the trial court granted, no request was made by the parties to expedite this appeal in this court. Indeed, the appeal was not lodged with this court until June 20, 2007.
[9] The Louisiana Legislature has enunciated the following dozen factors that courts are required to consider in deciding whether to allow a relocation:

(1) The nature, quality, extent of involvement, and duration of the child's relationship with the parent proposing to relocate and with the nonrelocating parent, siblings, and other significant persons in the child's life.
(2) The age, developmental stage, needs of the child, and the likely impact the relocation will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child.
(3) The feasibility of preserving a good relationship between the nonrelocating parent and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.
(4) The child's preference, taking into consideration the age and maturity of the child.
(5) Whether there is an established pattern of conduct of the parent seeking the relocation, either to promote or thwart the relationship of the child and the nonrelocating party.
(6) Whether the relocation of the child will enhance the general quality of life for both the custodial parent seeking the relocation and the child, including but not limited to financial or emotional benefit or educational opportunity.
(7) The reasons of each parent for seeking or opposing the relocation.
(8) The current employment and economic circumstances of each parent and whether or not the proposed relocation is necessary to improve the circumstances of the parent seeking relocation of the child.
(9) The extent to which the objecting parent has fulfilled his or her financial obligations to the parent seeking relocation, including child support, spousal support, and community property obligations.
(10) The feasibility of a relocation by the objecting parent.
(11) Any history of substance abuse or violence by either parent, including a consideration of the severity of such conduct and the failure or success of any attempts at rehabilitation.
(12) Any other factors affecting the best interest of the child.
La. R.S. 9:355.12(A).
[10] Mrs. McLain testified that the only time she had ever been to Tuscaloosa before she evacuated there in August 2005 was about three years earlier when she passed through with Mr. McLain on a trip. On that occasion, she spent a few hours in Tuscaloosa.
[11] Christian's birthday was three days after the hearing; thus, he was almost eleven at the time of the hearing.
[12] The major community asset is the funds from the sale of the family home, which are currently being held in escrow.
[13] According to Mr. McLain, he was diagnosed with Bipolar Disorder twelve years ago.